# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ANZETTA WARREN, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )   **Case No. 09 CV 6498** |
| | ) |
| MICHAEL ASTRUE, | )   **Magistrate Judge Young B. Kim** |
| *Commissioner of Social Security,* | ) |
| | ) |
| Defendant. | )   **July 27, 2010** |

## MEMORANDUM OPINION and ORDER

Before the court is Anzetta Warren's motion for summary judgment challenging the denial of her application for supplemental security income ("SSI") under the Social Security Act. *See* 42 U.S.C. §§ 405(g),1382c, 1383(c)(3). Warren claims that she is disabled by asthma, decreased vision, back pain, and several psychological impairments, including depression and post-traumatic stress disorder. For the following reasons, Warren's motion is granted and this case is remanded for further proceedings consistent with this opinion:

### Procedural History

Warren applied for SSI in October 2005, claiming that her disability began on May 1, 2003. (A.R. 32, 73.) The Social Security Administration denied her claim initially and on reconsideration.[1] (Id. at 32.) Warren then requested, and was granted, a hearing before an administrative law judge ("ALJ"). (Id. at 33.) The ALJ determined that Warren is not

---

[1] The decision denying reconsideration is not in the administrative record, but the parties do not dispute the administrative law judge's statement that reconsideration was denied on March 6, 2006. (A.R. 21.)

"disabled" as defined in the Social Security Act and concluded that she could return to her past work. (Id. at 30-31.) The Appeals Council granted Warren's request for review. On August 17, 2009, it issued a decision adopting the ALJ's findings in all respects except that it found her past relevant work "did not reach the level considered to be substantial gainful activity." (A.R. 6-7.) The Appeals Council nonetheless found that Warren is not disabled after applying Medical-Vocational Rule 202.10, (id. at 7), which counsels a finding of "not disabled" for a person of Warren's age who is capable of performing light work, *see* 20 C.F.R. § 404, Subpt. P, App. 2 ("grid rule 202.10"). Warren filed the current suit seeking judicial review of the Appeals Council's decision—which represents the final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 416.1481. The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

The administrative record in this case demonstrates that there are substantial barriers standing between Warren and gainful employment. The challenge the ALJ and Appeals Council confronted, as Warren's attorney acknowledged during the administrative hearing (*see* A.R. 194-96, 245), was determining whether those barriers are caused by a disability, rather than by Warren's particularly difficult personal circumstances. The record shows that Warren has been the victim of sexual assault more than once, beginning when she was only 10 or 11 years old. (Id. at 114.) She dropped out of school after eighth grade, began committing crimes in her teens, and has spent time in jail for home invasion and check

forgery. (Id. at 197-98, 207-11.) In the past 15 years she has not held a job for more than 20 months at a time, and she has struggled with drug abuse and homelessness. (Id. at 78, 198, 206, 211.) At the time of her hearing, she had escaped homelessness by agreeing to clean rooms at a motel on Chicago's southwest side in exchange for a room in the motel. (Id. at 198-99.) Despite that arrangement, Warren maintains that she cannot perform substantial gainful activity because she is disabled by asthma, vision problems, back pain, depression, post-traumatic stress disorder, and anti-social tendencies. At her March 31, 2008 hearing before an ALJ, Warren offered both documentary and testimonial evidence to support her claims.

### A. Warren's Evidence

Warren testified that she cannot work because she has disabling pain in her right leg, back, and arms. (A.R. 202.) She said that her back is the source of her worst pain. (Id. at 216.) On a scale of one to ten Warren rated her back pain as sometimes at a five or six, and other times as high as a nine. (Id. at 217.) Warren described arm pain that feels "like little needles pinching in" and pain in her right leg from her toe to her hip, all of which she rated at a nine. (Id. at 218-19.) She also said that she suffers from "bad headaches," which she attributes to having her head "busted" in numerous fights when she was younger. (Id. at 219.) Warren explained that she treats her pain with "pain pills," including ibuprofen, and Tylenol 3 with codeine, which she gets from unidentified people she knows. (Id. at 214.) Warren said that the pills help relieve her pain only sometimes. (Id. at 217.)

The ALJ asked Warren why she had not sought medical treatment for her pain. Warren explained that she had seen a doctor at the Englewood Health Center, but said that the clinic staff told her she would have to pay for the treatments, which she cannot afford to do. (A.R. 202-03.) She testified that she tried to obtain a state medical card, but she could not get one because she did not have a social security card or state identification. (Id.) When the ALJ told Warren that there are clinics where she could obtain treatment without a medical card, she responded that the clinic she had visited told her that without a medical card she would have to pay for treatment. (Id. at 214.)

Warren also discussed her psychological struggles. She described feeling threatened, as though people are "coming up on" her, and said that she sometimes hears footsteps outside her door when no one is there. (A.R. 222.) She has suicidal thoughts but said she tries "not to think about things like that." (Id. at 223.) Warren described getting into verbal altercations with people at the motel as often as three times a week. (Id. at 224-25.) She described feeling sad and only looking forward to being by herself in her room. (Id. at 231.) Warren explained that she had received counseling at the Chicago Department of Public Health, but said that she stopped attending because she had to walk to get there, and her leg and back pain made that impossible. (Id. at 220.) She submitted records from the Chicago Department of Public Health describing her as having poor judgment and concentration, memory impairment, impulsivity, and suicidal ideation. (Id. at 153.)

As for her struggles with substance abuse, Warren testified that she had been clean and sober for "about two and a half years," but before getting clean she abused alcohol and used "a whole lot" of crack. (A.R. 211-12.) She described using crack "every day, all night long." (Id. at 212.) Warren told the ALJ that she had been able to get clean on her own. (Id.)

The ALJ questioned Warren at length about her work cleaning the motel where she was staying and her other daily activities. (A.R. 204.) Warren said that she needs to clean for about four to five hours a day, four or five days a week. (Id.) She said that when her pain makes it too difficult for her to clean, her daughter—who was also living in the motel—would do the work for her. (Id. at 205.) Warren described her responsibilities as changing the linens, wiping down surfaces, and sweeping. (Id.) She explained that she cannot use the vacuum or clean under the beds and said that residents complain about her work. (Id. at 205, 226.) She said that she forces herself to work through the pain because otherwise she would have no place to live. (Id. at 219.) Warren said that when she is not cleaning she spends her day in her room watching television. (Id. at 212.) She said she only has one friend and that they usually talk on the phone rather than visit in person. (Id. at 213.)

In support of her testimony Warren submitted medical records spanning the period from January 2005 to May 2006. In January 2005 Dr. Kenneth Gong examined Warren at the behest of the SSA. (A.R. 105.) Dr. Gong described Warren's main complaints as back pain and asthma. (Id.) He noted that exposure to bleach, dust, and other smells trigger her

asthma, but said that her use of an albuterol inhaler "is helpful." (Id.) Dr. Gong reported that Warren had "mild to moderate difficulty" getting on and off the examination table and noted that she had "diffuse tenderness to even the slightest palpation throughout her spine." (Id. at 106-07.) An MRI of her spine showed mild degenerative changes with some narrowing in the areas of disc space and "what appear to be prominent atherosclerotic calcifications." (Id. at 118.) Dr. Gong noted that Warren walked with a slight limp and had "decreased ability to finger and manipulate." (Id. at 107.) He conducted visual testing which revealed visual acuity of 20/50 in the right eye and 20/200 in the left. (Id. at 110.) Dr. Gong diagnosed Warren as having asthma, chronic low back pain, bilateral wrist pain that could be carpal tunnel syndrome, and polysubstance abuse. (Id. at 108.)

In January 2006 the SSA asked Dr. Robert Prescott to evaluate Warren's mental status. (A.R. 111.) Warren told Dr. Prescott that she used cocaine and marijuana and drank a six pack of beer once or twice a month. (Id. at 112.) She described having only one friend and reported getting along with only one of her five living children (her sixth child had died). (Id. at 112-113.) She told Dr. Prescott that she feels depressed, worries a lot, has trouble sleeping, and experiences frequent severe headaches. (Id. at 113.) She reported attempting suicide several times between 1980 and 2000. (Id. at 114.) She described being the victim of more than one sexual assault, and told Dr. Prescott that she does not trust people. (Id.) Dr. Prescott diagnosed Warren as suffering from major depression, post-traumatic stress disorder, polysubstance abuse, and adult anti-social activities. (Id. at 115.)

Warren also submitted residual functional capacity ("RFC") assessments completed by two consulting physicians in January 2006. Dr. Frank Jimenez evaluated her physical limitations. (A.R. 119-26.) He opined that Warren can stoop, crawl, or crouch only occasionally, and is limited in fingering and far visual acuity. (Id. at 121-22.) Dr. Jimenez also said that she should avoid concentrated exposure to fumes, odors, dusts, etc, which could exacerbate her asthma. (Id. at 123.) Dr. Carl Hermsmeyer evaluated Warren's mental limitations. (Id. at 127-44.) He opined that Warren is moderately limited in her ability to understand, remember, and carry out detailed instructions. (Id. at 127.) Dr. Hermsmeyer did not find her to be significantly limited in concentration, persistence, or social interactions and said that she could "perform simple one and two-step task [*sic*] at a consistent pace." (Id. at 128-29.) But in the accompanying psychiatric review technique form, Dr. Hermsmeyer found that Warren had moderate limitations in social functioning and maintaining concentration, persistence, or pace. (Id. at 141.)

## B.    The Medical Expert's Testimony

The ALJ called clinical psychologist Ellen Rozenfeld to testify as a medical expert. Dr. Rozenfeld opined that Warren has moderate limitations in social functioning, noting that she has enough social skills to maintain her housekeeping work but that she sometimes starts verbal fights. (A.R. 228.) She also testified that Warren has moderate limitations in concentration, persistence, or pace. (Id. at 229.) Dr. Rozenfeld testified that Warren was limited in her ability to complete complex tasks, but said that she "possesses adequate mental

capacity to understand, remember, and carry out simple, routine tasks." (Id. at 230.) She further testified that although Warren should have only brief, superficial contact with the public, she was not significantly limited in relating to co-workers or supervisors. (Id.) Dr. Rozenfeld explained that Warren has a reduced tolerance for stress and accordingly needs a "routine, repetitive work environment." (Id.)

### C. The Vocational Expert's Testimony

Next the ALJ called vocational expert James Radke, who described Warren's past work as a security guard and a housekeeper/cleaner as light and unskilled. (A.R. 234.) He noted some confusion over whether she had worked as a cook or just a food server in the past. (Id. at 236-37.) Radke testified that cook positions typically are characterized as skilled or semi-skilled and light or medium in exertion. (Id. at 236.) He described the food server position as unskilled. (Id. at 237.) The ALJ asked Radke to assume a person of Warren's age and education level and limitations of doing light work with occasional fingering, limited far acuity, and the need to avoid concentrated fumes. (Id. at 237-38.) The ALJ further specified that the work would be simple, involving routine stress and only brief interactions with the public. (Id.) Radke testified that a person with those limitations could perform Warren's past work as a housekeeper or food server, but not as a security guard. (Id. at 238.)

### D. The ALJ's and the Appeals Council's Decisions

After considering the proffered evidence, the ALJ concluded that Warren is not disabled. In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R.

§ 404.1520, which requires her to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If at step three of this framework the ALJ finds that the claimant has a severe impairment which does not meet the listings, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the residual functional capacity to determine at steps four and five whether the claimant can return to her past work or to different available work. *Id.* § 404.1520(f), (g).

Here, the ALJ found at step one that it was unclear whether Warren's work in exchange for rent at the motel where she was staying amounts to substantial gainful activity, so the ALJ proceeded with the sequential evaluation process. (A.R. 23.) At step two the ALJ determined that Warren has severe impairments consisting of asthma, decreased vision, chronic low-back pain, major depressive disorder with post-traumatic stress disorder and anti-social tendencies, and polysubstance use "in claimed remission." (Id.) At step three the ALJ determined that Moore had only mild restrictions in daily living and moderate limitations in social functioning and concentration, persistence, or pace, and thus concluded that her impairments did not meet or medically equal any listed impairment. (Id. at 24-25.)

9

Proceeding to step four of the analysis, the ALJ determined that Moore has a residual functional capacity ("RFC") to perform light work with several limitations. (A.R. 25-26.) Specifically, the ALJ concluded that Warren is limited in fine manipulation and should avoid concentrated exposure to pulmonary irritants. (Id. at 26.) The ALJ further found that Warren could engage in simple, routine work "requiring no more than occasional need for far acuity" and involving "only brief interaction with the public." (Id.) The ALJ noted that the record was sparse on objective medical records, and said that it would be "reasonable to expect someone experiencing severe pain to pursue more aggressive pain management and other medical treatment." (Id. at 27-28.) The ALJ considered the lack of medical records to reflect poorly on Warren's credibility with respect to her description of the severity and duration of her pain. (Id. at 228.) The ALJ stated that Warren's credibility was further diminished by her check-forgery conviction and her assertions that she quit abusing drugs and alcohol without help. (Id.) Having determined Warren's RFC, the ALJ concluded that Warren could return to her past relevant work as a cleaner or food-tray assembler. (Id. at 30-31.) The ALJ thus concluded that Warren is not disabled as defined by the Social Security Act, and denied her SSI application. (Id.)

The Appeals Council granted Warren's request for review of the ALJ's decision, but agreed with the ALJ's findings under steps one through three. (A.R. 8.) At step four, the Appeals Council adopted the ALJ's conclusions regarding Warren's credibility and RFC, but disagreed with the ALJ's finding that Warren can return to her past work, because it found

that her earnings from the housekeeper and food-tray assembler jobs did not reach the requisite level for substantial gainful activity. (Id. at 7.) Accordingly, it concluded that Warren has no past relevant work. (Id.) Instead of remanding the case to the ALJ to determine what work, if any, Warren could perform, the Appeals Council applied grid rule 202.10, which directs a finding of not disabled for a claimant of Warren's age who retains an RFC to perform a narrow range of light work. (Id.) It thus concluded that Warren is not eligible for SSI. (Id. at 9.)

## Analysis

In the current motion for summary judgment, Warren challenges the ALJ's RFC determination and the Appeals Council's application of grid rule 202.10. Specifically, she argues that the ALJ's adverse credibility finding—which the Appeals Council adopted—failed to account for the barriers to treatment posed by poverty and Warren's mental condition. Next, she argues that the ALJ did not consider all of her impairments in crafting the RFC—again, the Appeals Council adopted the ALJ's findings with respect to the RFC. In particular, she argues that the ALJ overlooked her limitations with respect to concentration, persistence, or pace. Finally, Warren argues that the Appeals Council improperly applied grid rule 202.10, which does not account for her nonexertional limitations. In response, the Commissioner defends the ALJ's step-four analysis and argues that any error committed by the Appeals Council was harmless.

In reviewing the Commissioner's decision to deny Warren benefits, this court asks only whether the ALJ and Appeals Council applied the correct legal standards and reached a decision that is supported by substantial evidence. 42 U.S.C. § 405(g); *Likowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009); *Buckner v. Astrue*, 680 F.Supp.2d 932, 938 (N.D. Ill. 2010). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). It is a generous standard that precludes this court from reweighing the evidence or substituting its judgment for that of the administrative decision maker. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). But this court will remand the case if the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002), or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotation omitted).

Warren persuasively argues that the ALJ's credibility determination—which, given the paucity of medical records, is critical in this case—is legally erroneous and unsupported by substantial evidence. This court must be cautious in wading into this territory, because an ALJ is afforded significant deference in determining credibility—a determination that will be reversed only if found to be "patently wrong." *See Schmidt v. Astrue*, 496 F.3d 833, 843

(7th Cir. 2007). But the court has "greater freedom to review the ALJ's decision" where "such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Here, the ALJ's first two explanations for the adverse credibility finding are objective—she points to the lack of medical records and faults Warren for failing to pursue medical treatment. But as voluminous precedent has made clear, an ALJ cannot disregard complaints of pain simply because "they are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at **1-2; *see also Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (collecting cases). Nor may an ALJ make a negative inference from a claimant's failure to seek medical care without exploring the reasons for that failure. *Craft*, 539 F.3d at 679. Inability to afford treatment is one valid explanation for failure to seek treatment, *id.*; mental illness is another, *Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006). Here Warren explained to the ALJ that she sought treatment at a clinic but was told she either must obtain a medical card or pay. (A.R. 203.) She then described the efforts she undertook to obtain a medical card, and explained that her efforts were stymied by her inability to locate or obtain her official identification. (Id.) Although the ALJ acknowledged that testimony in her recitation of the background, she erroneously failed to account for it in the credibility analysis. (Id. at 27-28.) The Commissioner attempts to defend the ALJ's finding by arguing that Warren's testimony demonstrates a lack of diligence on her part, (*see* R. 22, Resp. at 6-7), but even if that were an apt description of what happened, the Seventh Circuit has made clear that "[l]ack of

13

discipline, character, or fortitude is not a defense to a claim for disability benefits," *DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989). Nor did the ALJ explore whether Warren's documented deficiencies in attention, persistence, or pace might have impacted her treatment-seeking or her fruitless attempt to acquire insurance. Because the ALJ did not analyze the potential barriers posed by her poverty and mental condition before faulting Warren for failing to pursue treatment that would produce medical records, those explanations for the adverse credibility finding cannot stand. *See Craft*, 559 F.3d at 679; *Martinez v. Astrue*, 09 CV 3051, 2010 WL 1292491, at *10 (N.D. Ill. Mar. 29, 2010).

The ALJ also found incredible Warren's testimony that two and a half years before the hearing, she stopped using drugs and abusing alcohol. First, the ALJ noted that medical records report that she was using marijuana in May 2006, which was 22 months before the hearing. (A.R. 28.) The ALJ made too much of the timeline difference. Warren testified that she got clean "about two and a half years ago," and later testified that she would "say" it was "two years ago." (Id. at 211.) Because the ALJ did not try to pin Warren down to a specific date or ask whether she got clean before May 2006, the two-month difference between the medical record and Warren's testimony is a fairly weak discrepancy. Nor did the ALJ consider whether Warren's mental impairments, which are documented as including memory impairment, (id. at 153), might explain that discrepancy. More troubling is the ALJ's comment that Warren lacks credibility because, according to the ALJ, "it is not usual for heavy drug abusers to control their addiction without the help of a program, mentor

organization, or life incident as a catalyst." (A.R. 28.)  The ALJ cites no record evidence to

support that assumption, nor did this court find any in its independent review of the record.

Neither did the ALJ explore with Warren how she quit using or whether she experienced

some "life incident" that motivated her sobriety.  Perhaps her financial inability to buy drugs

forced her to quit.  Although the ALJ's assumption regarding the difficulty of fighting drug

addiction may have intuitive appeal, the ALJ is not permitted to base her decision on intuition

or hunches.  *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).

Accordingly, the negative inferences the ALJ drew from Warren's description of her sobriety

do not support the adverse credibility determination.

That leaves two explanations underlying the ALJ's credibility determination, only one

of which is supported by the record.  First, the ALJ states that Warren testified "that she

didn't like medical treatment, yet she testified that she was willing to obtain pain pills from

her friends." (A.R. 28.)  This court has thoroughly reviewed the transcript and cannot find

the statement the ALJ is referencing.  Warren explained clearly that she did not seek medical

treatment because she had no insurance and could not afford it, not because she "doesn't

like" it.  And even if Warren had so testified, it is unclear why her supposed distaste for

medical treatment, by which she could have meant visiting doctors or undergoing testing, is

inconsistent with her willingness to take pills to relieve her pain.  Because this reason is

unsupported by the record, this court disregards it.  *See Blake ex rel. Wolfe*, 331 F.3d at 570.

That leaves only the ALJ's recognition that Warren had been convicted in the past for fraud:

specifically, check forgery.  Although Warren's conviction for what amounts to a crime of dishonesty is probative of her credibility, *cf.* Fed. R. Evid. 609(a)(2); *United States v. Gulati*, 230 F.3d 254, 261 (7th Cir. 2000), given this court's finding that four of the five other reasons the ALJ gave are erroneous, her criminal history standing alone is too weak a platform to support the ALJ's disregard for her descriptions of her pain and mental impairments. *See Craft*, 539 F.3d at 680 (holding that where objective evidence contradicted two of three reasons for finding claimant incredible, adverse credibility determination was patently wrong).

Next, Warren argues that the ALJ erred in failing to account for all of her impairments in crafting the RFC.  Her strongest argument in this regard is that the ALJ improperly accounted for Warren's limitations with concentration, persistence, or pace by limiting her to routine, simple work.  The Seventh Circuit has held that limiting a claimant to simple, routine tasks does not sufficiently account for limitations in concentration, persistence, or pace, because "[e]mployers are entitled to demand that their employees stick with the job," and whether a person has the understanding to perform more than simple work is a different question than whether they can perform that work "consistently once trained." *Karsarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); *see also Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (noting that limiting claimant to routine work does not account for impairments in concentration).  But as with most general rules, this one has an exception: where a doctor provides an opinion finding that a claimant can perform low-stress, repetitive

work despite moderate limitations in concentration, persistence, or pace, the ALJ may rely on that opinion in crafting the RFC. *See Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).

Here, the ALJ stated that an RFC for routine, simple work accounts for what she identified as Warren's "moderate difficulties in maintaining concentration, persistence or pace." (A.R. 30.) The ALJ stated that she based that finding on the testimony of the medical expert, Dr. Rozenfeld. (Id.) After Dr. Rozenfeld testified that Warren has moderate limitations in concentration—an opinion backed up by the records from the Chicago Public Health Department and Dr. Hermsmeyer, (*see* id. at 141, 153)—the ALJ asked her to explain how Warren's "medical impairments" would limit her ability to function in a work setting, (id. at 229). Dr. Rozenfeld testified that Warren has a reduced capacity to tolerate stress, but said that her impairment could be accommodated by "a routine, repetitive work environment." (Id. at 230.) She further clarified that such a work environment would counteract Warren's limited capacity to make judgments. (Id.) Thus Dr. Rozenfeld specifically tied the routine-work restriction to Warren's limitations with respect to stress and judgment, but did not explain whether or how such a restriction would accommodate her limitations in concentration, persistence, or pace. Because Dr. Rozenfeld's testimony does not support the ALJ's decision to link Warren's attention deficit to routine work, the RFC does not properly account for all of her limitations. *See Stewart*, 561 F.3d at 684-85; *Tarbush v. Astrue*, 09 CV 3400, 2010 WL 438155, at *6 (N.D. Ill. Feb. 2, 2010) ("To say that

Plaintiff can do a simple and routine job is not necessarily to say that she has the concentration or persistence to do it for a sustained period at an acceptable pace.").

Warren argues that two other aspects of the ALJ's RFC lack a logical foundation. First, Warren characterizes as illogical the ALJ's finding that she is limited to using far visual acuity only occasionally, pointing out that someone either has far visual acuity or not. This is a fair characterization, especially because the only explanation the ALJ provided is to say that "Snellen test results from January 5, 2005 support the limitation on far acuity included in the [RFC] assessment." (A.R. 28.) The Snellen test the ALJ referenced shows that Warren has visual acuity of 20/50 with pinhole correction, but provides no insight into why she could "occasionally" engage in far acuity.[2] Second, Warren argues that the ALJ erred in relying on what she calls Dr. Rozenfeld's illogical testimony that Warren's depression and antisocial tendencies would restrict her from interacting with the public, but not with coworkers and supervisors. There is ample evidence in the record documenting Warren's tendency to get involved in verbal (and historically, physical) altercations, her impulsivity, and her mistrust of others. The ALJ made no attempt to elicit from Dr. Rozenfeld how Warren's anti-social tendencies and other social impairments would impact her ability to deal with supervisors and co-workers differently than it would with respect to the general public. That information seems particularly pertinent given Dr. Prescott's observation that Warren

---

[2] This court notes that the Appeals Council omitted this limitation in its description of Warren's RFC. (A.R. 8.) But because the Appeals Council said that it "adopts the Administrative Law Judge's findings on the claimant's residual functional capacity," (id. at 7), the court assumes the omission was unintentional.

reported difficulty taking orders and arguing often with past co-workers.  (Id. at 113.)

Because the ALJ did "not sufficiently connect[] the dots" between Warren's substantiated

social impairments and the RFC finding, the RFC "falls short." *See Young v. Barnhart*, 362

F.3d 995, 1002-03 (7th Cir. 2004) (remanding where ALJ did not explain how limited

contact with coworkers and public accommodates difficulty in accepting instruction,

criticism, etc.).

Finally, Warren argues that the Appeals Council improperly applied grid rule 202.10

to find her not disabled.  As Warren points out, the grid uses a mechanical formula to assist

with disability determinations where a claimant meets straight-forward criteria, but it

"abounds in gaps." *DeFrancesco*, 867 F.3d at 1045.  It does not account for every

nonexertional limitation a claimant might possess, which is why in many cases an ALJ

consults a vocational expert to explain "whether there are enough jobs that *this* claimant can

*actually* do," given her unique limitations. *Id.* (emphasis in original); *see also Villano v.*

*Astrue*, 556 F.3d 558, 564 (7th Cir. 2009) (noting that grid "does not account for

nonexertional limitations").  As described above, the ALJ's RFC for Warren included a

number of nonexertional limitations, from the limitation on far acuity, to the need for routine

work, to the restricted contact with the public.  The Appeals Council applied the grid to find

Warren not disabled without acknowledging that the grid does not account for those

restrictions. *See Villano*, 556 F.3d at 564.

The Commissioner does not defend the application of the grid, but instead argues that the Appeals Council's error was harmless because during the hearing Radke testified that there are a number of housekeeping and food preparation jobs that Warren could perform in the regional economy. The Commissioner points out that the Appeals Council did not find Warren incapable of performing that work; rather, it found that the past work she performed did not amount to substantial gainful activity. But especially given the errors this court has identified in the ALJ's RFC assessment, Warren has shown that the application of the grid here was harmful error. *See Shinseki v. Sanders*, 129 S.Ct. 1696, 1706 (2009) (holding that burden of showing harmful error falls on party seeking reversal). Because the ALJ must reassess the RFC, it would be pure speculation for this court to agree with the Commissioner's position that the ALJ would find Warren disabled based on Radke's testimony. Accordingly, this court cannot find that the Appeals Court's error was harmless. *See Parker*, 597 F.3d at 924; *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) (noting that speculation is "no substitute for evidence").

## Conclusion

For the foregoing reasons, Warren's motion for summary judgment is granted and the case is remanded for further proceedings consistent with this opinion. On remand the Commissioner should reevaluate Warren's credibility and reconcile the RFC with Warren's various limitations. Given the Appeals Council's finding that Warren's past work was not substantial gainful activity, the Commissioner also should evaluate whether Warren is capable of performing other jobs in the national economy.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**